IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No.

DION ROSBOROUGH,

RYAN LUMBA,

TONY BRISCOE, and

JON BOIK, Next Friend

of ALEXANDER BOIK.

       Plaintiffs,

vs.

CINEMARK, USA, INC., d/b/a CENTURY AURORA 16,

       Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiffs Dion Rosborough, Ryan Lumba, Tony Briscoe, and Jon Boik, next friend of Alexander J. Boik, by and through attorneys, THE SAWAYA LAW FIRM, P.C., hereby submit their Complaint and Jury Demand against the above captioned defendant. As grounds therefor, Plaintiffs state and allege as follows:

## JURISDICTION

1. At all times relevant to this case, Plaintiff Dion Rosborough (hereinafter "Plaintiff Rosborough") was a resident of the State of Colorado and presently resides at 11934 E. Kepner Drive, Aurora, CO 80012.

2. At all times relevant to this case, Plaintiff Ryan Lumba was a resident of the State of Colorado and presently resides at 4456 S. Himalaya Ct., Aurora, CO 80015.

3. At all times relevant to this case, Plaintiff Tony Briscoe was a resident of the State of Colorado and presently resides at 19354 E. 41st Avenue, Denver, CO 80249.

4. At all times relevant to this case, Plaintiff Alexander J. Boik was a resident of the State of Colorado. Jon Boik, as father and next-of-kin of Alexander J. Boik, presently resides at 2210 E. Vista Drive, Phoenix, AZ 85022.

5. Upon information and belief, Defendant Cinemark, USA, Inc., d/b/a Century Aurora 16 is a Texas Corporation with its principal place of business at 3900 Dallas Parkway, Suite 500, Plano, Texas, 75093. The theater where the incidents forming the basis for this complaint was and is located at 14200 – 14300 E. Alameda Avenue, Aurora, CO 80012 in the County of Arapahoe, State of Colorado.

6. This Court has jurisdiction over Plaintiffs' claims against Defendant pursuant to 28 U.S.C. §1332, since there is complete diversity of citizenship between the parties, and the amount in controversy herein exceeds the sum of $75,000.00, exclusive of costs and interest.

7. Venue is proper herein pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to this claim occurred in the District of Colorado.

## **GENERAL ALLEGATIONS**

8. Upon information and belief, before July 20, 2012, the area at or near the location of Century Aurora 16 theater, previous disturbances, incidents, disruptions and other criminal activities had taken place. These incidents most commonly occurred during the evening hours.

9. Based upon this knowledge, Defendant hired various security personnel, including, but not limited to, off-duty law enforcement officers from the City of Aurora Police Department.

10. Upon information and belief, Defendant staffed the theater with security personnel on Friday and Saturday night showings only.

11. The theater is set on property adjacent to a mall complex ("Aurora Town Center").

12. The theater has a parking lot surrounding the theater building, including, but not limited to an area behind Auditorium 9.

13. On July 20, 2012, the theater held a midnight premier of the movie, "The Dark Knight Rises." Prior to the showing, the theater advertised this midnight premier and sold tickets to the public to attend.

14. The movie, "The Dark Knight Rises," was screened in two separate movie auditoriums at the theater, Auditorium 8 and Auditorium 9, to accommodate attendees of the movie.

15. Despite the attendance numbers for this midnight premier, and upon information and belief, Defendant did not have security personnel at the theater, or did not have adequate security personnel at the theater.

16. Upon information and belief the exterior doors to the theater were either not equipped with an alarm system, or had alarms that were not functioning, or were not equipped with any security features that would have put Defendant on notice that the doors were being used, propped open, or held ajar nor put the Defendant on notice that the building was being entered unlawfully through those doors.

17. Upon information and belief, Defendant did not have, or did not implement, any system of security procedure, security training of its employees, or other training or operation to prevent or deter unlawful admittance into the theater through unlocked, unalarmed, or unmonitored doors.

18. Upon information and belief, theater employees did not have, or did not implement, a system for monitoring parking areas or exterior doors; nor, were employees monitoring the parking areas or exterior doors during the midnight showing of "The Dark Knight Rises." This failure to monitor permitted a person to re-enter the theater without fear of interference or being discovered, and further permitted a person to leave the door open for a period of time.

19. Upon information and belief, at least one person present at the midnight showing of "The Dark Knight Rises," exited Auditorium 9 through an emergency exit located to the right, front side of the screen. This person (hereinafter, "the gunman") was able to re-enter freely through the unarmed and un-alarmed emergency exit door.

20. Upon information and belief, the gunman purchased a ticket to the midnight showing of "The Dark Knight Rises," and entered the theater along with the other patrons through

the main entrances. After the lights had gone down in Auditorium 9, the gunman moved to the front right of the auditorium and exited through the exterior door to the parking lot.

21. Upon information and belief, the gunman moved his car to a location near the exterior door of Auditorium 9.

22. Upon information and belief, while the movie was playing in Auditoriums 8 and 9, the gunman propped open the exterior door of Auditorium 9 where they remained open for a period of time without being noticed by theater personnel.

23. Upon information and belief, the gunman retrieved from his vehicle weapons, ammunition, and canisters of a gas, as well as tactical gear.

24. Upon information and belief, these materials were moved to a place at or near the opened exterior door of Auditorium 9 without notice by theater personnel.

25. Upon information and belief, the gunman was able to bring into the theater one or more fully loaded shotguns, an assault rifle, one or more fully loaded handguns, and several tear gas canisters. He was also able to bring in a significant amount of ammunition and put on tactical body armor and a gas mask.

26. The amount of weapons and ammunition brought into Auditorium 9 required time, space, and convenience without fear of monitoring or patrol by security or theater personnel.

27. Upon information and belief, the gunman exited and re-entered the theater at least one time and was not discovered, monitored, or noticed by theater personnel.

28. Plaintiff Rosborough also attended the July 20, 2012 midnight premier of "The Dark Knight Rises." Plaintiff Rosborough was seated in Auditorium 9.

29. Plaintiff Lumba also attended the July 20, 2012 midnight premier of "The Dark Knight Rises." Plaintiff Lumba was seated in Auditorium 9.

30. Plaintiff Briscoe also attended the July 20, 2012 midnight premier of "The Dark Knight Rises." Plaintiff Briscoe was seated in Auditorium 9.

31. Plaintiff Boik also attended the July 20, 2012 midnight premier of "The Dark Knight Rises." Plaintiff Boik was seated in Auditorium 9.

32. Upon information and belief, the gunman began his assault by throwing tear gas canisters into the auditorium. These canisters were thrown from the front right area of Auditorium 9 toward the upper and middle area of the auditorium.

33. Upon information and belief, the gunman then began shooting with his various weapons into the crowd of patrons. Several people in Auditorium 9 and one person in Auditorium 8 were struck by gunfire.

34. Plaintiff Rosborough was struck by gunfire while attempting to flee Auditorium 9.

35. Plaintiff Lumba was struck by gunfire while attempting to flee Auditorium 9.

36. Plaintiff Boik was struck by gunfire while attempting to flee Auditorium 9.

37. After the initial episode after the throwing of the tear gas canisters, the gunman continued to shoot at people for several minutes. Throughout this shooting, the theater lights remained very low or off and the film continued to play upon the screen.

38. Upon information and belief, no alarm was sounded or action taken by any theater employee to assist in the evacuation of the many people in Auditorium 9.

39. Upon information and belief, the gunman continued shooting into the auditorium until such time as his weapon jammed or ceased working, at which time the shooting stopped.

40. Upon information and belief, no employee, security person, or any other theater personnel intervened during the incident, nor immediately following the incident when the gunman exited once again through the exterior door of Auditorium 9 and went to his car.

41. Upon information and belief, in the minutes following the shooting, the movie continued to play, the house lights continued to be off or very low, and no theater employee assisted in any evacuation of those remaining in the theater.

## FIRST CLAIM FOR RELIEF
## PREMISES LIABLITY PURSUANT TO C.R.S. § 13-21-115

42. Defendant operated and maintained the theater, and is a "landowner" under the definition of that term included in the Colorado Premise Liability Act (PLA), found at C.R.S. § 13-21-115(1).

43. Plaintiffs were "invitees" of Century Aurora 16 on July 20, 2012, for the purpose of attending a midnight showing of a movie, pursuant to the definition set forth in C.R.S. § 13-21-115(5)(a).

44. The Defendant had a duty of reasonable care to protect Plaintiffs, and others similarly situated, against dangers of which Defendant actually knew or should have known, pursuant to C.R.S. § 13-21-115(3)(c)(I).  Those dangers included the fact of dangerous and criminal activity that had previously taken place at or near the theater.

45. Specifically, Defendant failed to comply with its duties to Plaintiffs and others similarly situated, in the following respects:

   a. Failure to employ and have present at the time of the showing of this movie security guards (including, but not limited to, off-duty law enforcement officers) to protect against and reduce the risk of unlawful conduct that posed a risk of injury or death to patrons;
   b. Failure to provide reasonable protection against surreptitious, unauthorized entry into the darkened theater view areas;
   c. Failure to provide reasonable door entry security devices, including, but not limited to, automatic locking doors, alarms, warning signals and other such devices on the door located to the right front of Auditorium 9.
   d. Failure to provide other reasonable security devices such as one-way security doors, exit doors interlocked with warning signals, alarms, light or other devices which would put personnel on notice of any surreptitious, unauthorized entry into the darkened theater in viewing areas;
   e. Failure to develop, establish, and institute adequate emergency or first-aid response and evacuation plans and procedures for patrons in the theater in the vent circumstances called for such procedures;
   f. Failure to properly train employees in emergency, crisis, and first-aid response and evacuation procedures;
   g. Failure to properly train employees or provide reasonable surveillance procedures including, but not limited to, surveillance devices, monitors, cameras and human surveillance or monitoring of suspicious activity.
46. Defendant knew or should have known of the dangers and risks caused by its failures as noted above.

47. Defendant breached its duties as a landowner under the PLA by its failures as noted above, thereby allowing a dangerous condition to exist, and/or by creating a dangerous condition on its premises.

48. As a direct and proximate result of these dangerous conditions, Plaintiffs were severely injured and suffered non-economic damages, losses and injuries, including extreme physical, mental and emotional pain and suffering, emotional distress, impairment and/or loss of enjoyment of life, fear, and embarrassment.  These damages are recoverable by Plaintiffs pursuant to C.R.S. § 13-21-203.

49. As a direct and proximate result of these dangerous conditions, Plaintiffs suffered economic damages, losses and injuries, including medical expenses, lost wages (past and future), lost economic opportunities (past and future) out-of-pocket expenses and rehabilitation expenses.

50. As a direct and proximate result of these dangerous conditions, Plaintiffs also suffered significant disfigurement, and permanent physical impairment.

## SECOND CLAIM FOR RELIEF
## NEGLIGENCE

51. Plaintiffs hereby incorporate the allegations contained in paragraphs 1 – 41 above as if set forth fully herein.

52. Defendant had a duty to exercise reasonable care to provide for the safety and security of its patrons.

53. Defendant violated its duty of reasonable care that it owed its patrons in the following, but not limited to the following, ways:

    a. Failure to employ and have present at the time of the showing of this movie security guards (including, but not limited to, off-duty law enforcement officers) to protect against and reduce the risk of unlawful conduct that posed a risk of injury or death to patrons;
    b. Failure to provide reasonable protection against surreptitious, unauthorized entry into the darkened theater viewing areas;
    c. Failure to provide reasonable door entry security devices, including, but not limited to, automatic locking doors, alarms, warning signals and other such devices on the door located to the right front of Auditorium 9;
    d. Failure to provide other reasonable security devices such as one-way security doors, exit doors interlocked with warning signals, alarms, light or other devices which would put personnel on notice of any surreptitious, unauthorized entry into the darkened theater view areas;

    e. Failure to develop, establish and institute adequate emergency or first-aid response and evacuation plans and procedures for patrons in the theater in the event circumstances called for such procedures;

    f. Failure to properly train employees in emergency, crisis and first-aid response and evacuation procedures;

    g. Failure to properly train employees or provide reasonable surveillance procedures including, but not limited to, surveillance devices, monitors, cameras and human monitoring procedures.

54. As a direct and proximate result of Defendant's negligent conduct, Plaintiffs Rosborough, Lumba, and Briscoe suffered injuries, damages, and losses as set forth in Paragraphs 48, 49, and 50.

## THIRD CLAIM FOR RELIEF
## WRONGFUL DEATH

55. Plaintiffs hereby incorporate the allegations contained in 1 – 54 above as if set forth fully herein.

56. C.R.S. § 13-21-202 provides for recovery in an action for damages for the death of a person caused by the "wrongful act, neglect, or default" of another, if the act, neglect, or default is "such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof."

57. Pursuant to C.R.S. § 13-21-201(1)(c)(I), Jon Boik, as father of Alexander J. Boik, is a proper plaintiff in a claim for Alexander J. Boik's wrongful death.

58. Defendant owed a legal duty to Alexander J. Boik and negligently breached that duty as alleged above.

59. As a result of the subject incident on July 20, 2012, Alexander J. Boik was shot and killed.

60. Defendant was negligent as set forth above and Alexander J. Boik was not comparatively negligent.
61. As a direct and proximate result of Defendant's negligence, Alexander J. Boik suffered traumatic physical and/or emotional and/or psychological injuries which resulted in his death.
62. Had Alexander J. Boik survived the injuries he sustained in the July 20, 2012 incident, he would have been entitled to maintain an action and recover damages related to the incident.
63. As a result of Alexander J. Boik's wrongful and untimely death, Plaintiff Jon Boik has suffered economic and non-economic damages, losses and injuries, including extreme mental and emotional pain and suffering, emotional distress, loss of companionship, impairment of the quality of life and will suffer losses and injuries, extreme mental and emotional pain and suffering, emotional distress, loss of companionship, and impairment of the quality of life in the future.

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendant in an amount that will fully and fairly compensate them for their damages, losses, and injuries, both past and future. Plaintiffs also request judgment in their favor for pre-judgment and post-judgment interest as provided by statute, for costs, attorney's fees, expert witness fees and for all and such other and further relief as the Court deems proper.

PLAINTIFF REQUESTS THAT ALL ISSUES BE TRIED TO A JURY.

Dated: October 10, 2012.

Respectfully submitted,

/*s/Michael G. Sawaya*
Michael G. Sawaya, Esq.

/*s/Robert D. Wilhite*
Robert D. Wilhite, Esq.

/*s/Sandra L. Hagen*
Sandra L. Hagen, Esq.
SAWAYA, ROSE, MCCLURE & WILHITE, P.C.
1600 Ogden Street
Denver, CO 80218
Telephone: (303) 839-1650
Facsimile: (303) 832-7102
Email: msawaya@sawayalaw.com
rwilhite@sawayalaw.com
shagen@sawayalaw.com
Attorneys for Plaintiffs

Plaintiffs Addresses:
Dion Rosboroough
11934 E. Kepner Dr.
Aurora, CO 80012

Ryan Lumba
4456 S. Himalaya Ct.
Aurora, CO 80015

Tony Briscoe
19354 E. 41st Ave.
Denver, CO 80249

Jon Boik
2210 E. Vista Dr.
Phoenix, AZ 85022